IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO.: 3:24-CV-334

| | |
|---|---|
| NAYJA JOHNSON, ) | |
|       Plaintiff, ) | |
| v. ) | |
| ) | |
| ERIC TILLMAN, ) | **COMPLAINT** |
| In his individual capacity, ) | |
| ) | |
|     and, ) | |
| ) | |
| THE UNITED STATES OF AMERICA, ) | |
|       Defendants. ) | |

NOW COMES Plaintiff, Nayja Johnson (hereinafter "Nayja") by and through her undersigned counsel complaining of acts and or omissions of the Defendants, and hereby demands a jury trial on the following:

### PRELIMINARY STATEMENT

1. Frankie Jennings (hereinafter "Jennings"), was killed by Eric Tillman (Tillman) on or around March 23, 2021, in broad daylight at a Citgo gas station in Charlotte.

2. Jennings was killed in front of his fiancée Nayja Johnson and their minor son A.J.

3. Tillman works for the United States Marshals Service.

4. Tillman was part of the U.S. Marshals' Carolinas Regional Fugitive Task Force (hereinafter "CRFTF").

5. Other relevant members of the CRFTF included Mark Ruffin of Mooresville Police Department, Matthew Harris of the Gaston County Police Department, Jamie Terry of the North Carolina Department of Public Safety, Tate Mills of the Union County Sheriff, and Stephen Helms of the Monroe Police Department.

6. The CRFTF were attempting to serve warrants for state charges on Jennings who was believed to be in Charlotte, North Carolina.

7. One of the main missions of the CRFTF is to apprehend their "targets" and not kill them.

8. The CRFTF had not been under operation for more than two years before the March 23, 2021, killing of Jennings, and there were trainings that were still ongoing just to get the basics done according to Eric Tillman.

9. No member of the CRFTF was wearing body-worn camera at the time of the killing which would have been required by members of the Charlotte-Mecklenburg Police Department (hereinafter "CMPD") which is the local law enforcement agency for the City of Charlotte.

10. None of the relevant members of the CRFTF were members of CMPD.

11. According to Tilman, the CRFTF developed information that Frankie Jennings was staying at a Homewood Suites, likely to be in his girlfriend's name.

12. According to Tillman, while he was setting up to do surveillance in a Homewood Suites parking lot in Charlotte, Jennings was drove by him in a black Mercury Mariner (hereinafter "Mariner").

13. According to Tillman, he had other guys from the CRFTF coming into the area and he followed Jennings through Charlotte until they reached a car repair shop where Tillman was able to identify Jennings through binoculars.

14. According to Tillman he had not made contact with Jennings or Johnson, so he did not believe Jennings knew that the CRFTF was after Jennings.

15. Tillman had contemplated trying to have a bunch of Charlotte Mecklenburg Police Department ("CMPD") units roll in and assist trying to apprehend Jennings, because Jennings was just standing there for a minute at the car repair shop, although he did not know what Jennings was there for.

16. Tillman then watches Jennings get into a Mercedes but did not request CMPD units because he was fairly certain Jennings would flee and he knew where Jennings and Johnson would be staying at the hotel and they could go set up and try to apprehend Jennings there.

17. An unnamed member of the CRFTF spotted the Mercedes and the Mariner pull into a Citgo gas station up the street in the Plaza area of Charlotte.

18. According to Tillman, he had a good perimeter setup for Jennings and there were no other cars in the area at the gas station.

19. If there was actually an absence of cars at the gas station, the attempting arrest of Jennings would present a lesser risk to the public and Tillman thought it was a good idea to make an arrest there and now because Jennings was just filling up Johnson's car.

20. Surveillance footage from the Citgo capturing moments leading up to this killing shows that the Citgo was not empty and that there were other cars parked in the parking lot.

21. Surveillance footage from the Citgo capturing moments leading up to this killing shows that there was a steady flow of traffic on both Parkwood Avenue and the Plaza immediately around the Citgo.

22. Surveillance footage from the Citgo capturing moments leading up this killing shows Johnson's car parked at the gas station with Jennings filling up the Mariner.

23. Tillman was aware of Johnson's presence at the pump, and even viewed the gas pump and Johnson as collateral damage or additional barriers should Jennings try to drive off.

24. Despite knowing of Johnson's presence, having no prior plan at this location, the proximity to a major public intersection, the safety of patrons of the Citgo being in

jeopardy, Tillman and members of the CRFTF tried to execute an advanced and dangerous tactical maneuver known as vehicle containment.

25. Vehicle containment is a blocking of a vehicle which sometimes uses direct intentional contact of law enforcement vehicles with a "target's" vehicle.

26. Vehicle containment is a coordinated effort by law enforcement which uses the element of surprise, and often uses unmarked vehicles although law enforcement can use flashing lights or a loudspeaker to identify themselves.

27. Unmarked vehicles were used in this instance and no loudspeaker was used.

28. Although there was a warrant to arrest and serve Jennings, there was no warrant to arrest or serve Johnson or their minor child.

29. Johnson and her minor child movements were restrained by intentional sudden physical control of the vehicle containment maneuver.

30. Tillman was driving a navy-blue Chevrolet Tahoe. Tate Mills was driving a black pickup truck.

31. Mills pulls up behind the Mariner swiftly, then abruptly stopped the vehicle inches away from the Mariner.

32. Tillman comes around and stops his vehicle a couple feet away from the Mercedes.

33. Jennings puts his hands up and leaves the Mariner to get back inside the Mercedes, as Mills hops out of his truck to get Jennings.

34. Tillman hops out of the Tahoe and comes in front of the hood of his Tahoe and kicks or puts his foot on the door of the Mercedes door, while Mills is trying to open it.

35. At the start of the struggle between Jennings, Mills, and Tillman, there is no vehicle blocking the Mercedes.

36. An unmarked grey pickup truck has come beside Johnson's vehicle and is directly in front of Johnson.

37. Moments later a grey Tahoe is circling around Tillman's navy-blue Tahoe but is not in front of the Mercedes when the Mercedes is put in gear.

38. Tillman stated in relevant summary that he shot Jennings three times because he believed Jennings was going to blast through containment, because Mills fell down and was going to be dragged, and he feared for himself.

39. Surveillance footage shows that at no point did Mills fall on the ground nor was he falling to the ground.

40. Upon information and belief, Mills had his hands on the decedent Jennings left arm when the car was put into drive but Mills let go of Jennings.

41. Tillman also stated that Jennings was reaching towards the center console where a gun was in the cupholder with the muzzle faced down.

42. However, Tillman also admitted he never saw Jennings pick up the gun or get his hands on it.

43. Tillman shot Jennings three times.

44. The CRFTF pulled Jennings out of the vehicle after he was shot a dying in front Johnson.



45. Frankie Jennings was killed on his birthday.

## ADMINISTRATIVE FILING

46. Johnson re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

47. On or around December 8, 2021, within two years of the above, Johnson and her son served upon the U.S. Marshals Service claims, including Standard Form 95.

48. On or around December 10, 2021, counsel for the U.S. Marshals Service confirmed receipt of Johnson's claims and requested additional information

49. On or around December 16, 2021, counsel for the U.S. Marshals services received additional exhibits and documents in support of the claim.

50. More than six months have passed since the submission of plaintiffs' claims. As of the date of this Complaint, the United States has made no attempt to settle or resolve this claim.

## PARTIES AND VENUE

51. Johnson re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

52. All actions complained of took place in the city of Charlotte, venue is proper in the Western District of North Carolina pursuant to 28 U.S.C. § 1391.

53. Tillman is a Senior Inspector for the United States Marshals Service a federal agency under the United States of America.

54. At all times Tillman was acting under color of law and under the scope of his employment for the United States of America pursuant to 28 U.S.C. § 2674 the United States shall be liable for the acts or omissions as Tillman.

55. This Court has jurisdiction over this action because Plaintiff's claims arise under the Federal Torts Claim Act (FTCA) 28 U.S.C. § 2671 *et. seq*. and 28 U.S.C. § 1346(b)(1).

## FACTUAL ALLEGATIONS

### I. Intentional Infliction of Emotional Distress

56. Johnson re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

57. Tillman and the CRFTF were aware of Johnson's relationship with Jennings and had even mentioned setting up surveillance across from a YMCA near her apartment in Charlotte.

58. Tillman and the CRFTF developed information that Johnson had a hotel room at one of the Homewood Suites locations in Charlotte.

59. Tillman and the CRFTF followed Johnson and Jennings to the car repair shop in the Mariner where Jennings left the tire shop in a Mercedes, which was followed by the Mariner.

60. Tillman and the CRFTF intentionally decided to include Johnson against her will as a natural barrier and part of the vehicle containment.

61. Tillman and the CRFTF deliberately made a decision to include Johnson as an inevitable witness and a natural barrier as a part of the vehicle containment recklessly disregarding the high probability that severe emotional distress would result.

62. Tillman and the CRFTF had no previous prior plan to take Jennings through the advanced tactic of vehicle containment.

63. Tillman and the CRFTF had just started surveillance of Jennings.

64. Tillman admitted that the CRFTF was relatively new and that some members had not completed all of their basic training.

65. Tillman and the CRFTF freestyled a plan to undertake a dangerous coordinated maneuver at a busy intersection in Charlotte, around Johnson and other unsuspecting members of the public.

66. Tillman and the CRFTF's freestyled plan to include Johnson as part of the vehicle containment is extreme and outrageous behavior.

67. The result of Tillman and the CRFTF's freestyled plan was the Johnson and A.J. witnessing the killing of Johnson's fiancée from a couple feet away while handcuffed.

68. The result of Tillman and the CRFTF's freestyled plan was that Johnson's minor son A.J. witnessed his dad being killed from mere feet away.

69. Tillman and other members of the CRFTF pulled Jenning's body from the Mercedes as he was dying onto the street in front of Johnson.

70. Johnson was handcuffed by Mills and later taken to the ground as her son was restrained by members of the CRFTF.

71. Johnson did suffer severe and sustained emotional distress from grief, mental anguish, anxiety, depression, suicidal thoughts and other severe emotional distress.

72. Johnson has struggled as a parent to assist A.J. with dealing with what he witnessed in the events complained of in this action and preceding paragraphs.

73. Johnson is entitled to recover damages.

## II. NEGLIGENCE AND GROSS NEGLIGENCE

74. Johnson re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

75. Tillman and the CRFTF did not consider or comply with the standard of care for high-risk law enforcement operations.

76. Tillman had just arrived at the Homewood Suites to set up surveillance and hopefully locate Jennings.

77. Upon locating Jennings, Tillman followed Jennings and Johnson through the city of Charlotte to pick up the Mercedes.

78. Tillman did not believe that Jennings or Johnson were aware that he and the CRFTF were following them and therefore had no reason to attempt to come up with a plan in the spur of the moment.

79. Tillman had considered attempting to apprehend Jennings while he was at a car repair shop because he was just standing there although he had just begun surveillance of Jennings.

80. This apprehension did not consider the risk of threat to the public as Tillman said that the CRFTF only go after "violent felons," and he firmly believed that Jennings would flee if given the opportunity.

81. Tillman stated that some members of the task force had not finished some of the basic trainings on the recently established task force.

82. Defendants believed Jennings to be armed and should have known that any attempt to arrest him could result in a shootout, him attempting to flee, or other behavior which may pose a risk to the general public immediately around Jennings at the time of apprehension.

83. Defendants should have known that attempting a vehicular containment and arrest of Jennings at a gas station would put the unsuspecting public immediately around Jennings and Johnson and A.J. at risk of being involved in a chase or shootout or other risk of serious injury.

84. Defendants should have known that if they have to use deadly force through their firearms, discharging a gun at a gas station at a heavily trafficked intersection would pose a significant risk of danger to the public immediately around the Citgo.

85. Defendants should have known that a vehicle containment sometimes involves a vehicular assault which is when law enforcement usually without warning rams and boxes in a subject's vehicle from multiple sides.

86. A vehicular assault positions unmarked vehicles in front of and in the back of the subject vehicle and traps the occupants of the vehicle through an intentional car crash.

87. Defendants should have known that these tactics cause chaos and confusion and can be violent in nature in addition to putting people immediately around this area at risk of serious injury.

88. A vehicular assault or containment should not have been attempted on or involved Johnson who was not suspected wanted for any crime.

89. Upon information Tillman had the ability to call off the vehicular containment but consciously proceeded because Jennings was outside of the car, just pumping gas for Johnson.

90. When the attempted vehicle containment begin, Jennings was just a few feet away from the Mercedes, and was in fact able to get back into the Mercedes and get the car in gear, which was a major concern to avoid for Tillman and the CRFTF.

91. No plan was agreed upon regarding the safety of Johnson and A.J. who were consciously and deliberately included in the freestyled plan by Tillman and the CRFTF.

92. No plan was agreed upon regarding the foreseeable seizure of Johnson who was included in the vehicle containment operation.

93. Johnson was seized by Mills after Jennings was shot and held against her will and handcuffed without probable cause of committing any crimes.

94. Johnson's seizure was a few feet away from her fiancée while he was dying while lying in the street after being dragged out of the Mercedes she just helped him pick up.

95. The U.S. Marshals policy directives instruct them to use the minimum force necessary, but that deadly force may be used only when necessary; that is when there is a reasonable

belief that the Jennings posed an imminent danger of death or serious physical injury to another person.

96. The U.S. Marshals policy directives instructs that deadly force may not be used solely to prevent the escape of a fleeing suspect.

97. The U.S. Marshals policy directives instructs that firearms may not be discharged at a moving vehicle unless a person in the vehicle is threatening the officer or another person with deadly force by means other than the vehicle; or the vehicle is operated in a manner that threatens to cause death or serious physical injury to the officer or others, and no objectively reasonable means of defense appear to exist, which includes moving out of the path of the vehicle.

98. Here, Tillman admitted that he did not see Jennings grab the gun, although he said he reached for towards the center console which is where the gun and the gear shift were.

99. Here Tillman believed the vehicle was moving and Tillman believed Jennings was a fleeing suspect.

100. Jennings made no verbal threats to shoot or kill any members of the CRFTF.

101. During the struggle between Mills, Tillman, and Jennings, the car was put into gear with Mills holding onto Jennings.

102. Both Mills and Tillman were at the driver's side of the Mercedes and out of the direct path of the Mercedes.

103. Tillman believed that Jennings in the smaller coupe Mercedes was attempting to "blast through containment" which would not have been a reasonable belief given his training and the size of the grey Tahoe which was circling around and setting up the last part of the vehicle containment in front of Jennings, compared to the smaller Mercedes.

104. The nature of vehicle containment and vehicle assault is characterized by using task force officer's vehicles to make direct and intentional vehicular contact between task force officers and a subject, there was no immediate threat of serious injury from a car moving from park and into gear at this speed.

105. Tillman shot Jennings who was inside the Mercedes three times while not being in the direct path of the vehicle, while not seeing Jennings grab the gun which was well within his reach and reportedly fearing the Mercedes car making slow moving contact with a Chevy Tahoe.

106. No member of the CRFTF reported hearing the engine rev before it made contact with the Tahoe.

107. Here Tillman admitted that the only possible injury to anyone may have occurred from the use of the movement of the Mercedes as a "weapon" which is against USMS policy.

108. The above paragraphs 74-108, show that Defendants fell below the standard of care necessary for high-risk operations.

109. The above paragraphs 74-108, show that Defendants consciously disregarded the foreseeable risks of causing severe emotional distress to Johnson by involving her in the vehicle containment tactic.

110. The above paragraphs 74-108, show that Defendants consciously disregarded the foreseeable risks of causing severe emotional distress to Johnson by killing her fiancée in front of her.

111. The above paragraphs 74-108, show that Defendants consciously disregarded the foreseeable risks of causing severe emotional distress to Johnson by seizing and

handcuffing her without probable cause while Jennings lay dying in close proximity to her.

112. But for the acts or omissions by Defendants set out in paragraphs 74-108, Johnson would not have suffered severe emotional distress.

113. This reckless and willful disregard of Johnson's rights and safety constitutes gross negligence.

114. Defendants' gross negligence is the proximate cause of Johnson's subsequent severe emotional distress which includes grief, anxiety, depression, and suicidal thoughts.

115. In the alternative, Defendants failure to comply with the standard of care in performing the attempted seizure of Jennings set out in all preceding paragraphs would constitute negligence.

116. Johnson is entitled to recover damages.

### III. Violation of North Carolina State Constitution

117. Johnson re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

118. Upon information and belief, the North Carolina legislature enacted Section 15A-401(b), at least in part, to promote the safety and protection of the general public by delineating the situations in which officers are permitted and not permitted to make warrantless arrests.

119. Defendants did not have a warrant to arrest Johnson.

120. Johnson had not committed a misdemeanor nor was she a threat to injure herself, others, or any property.

121. Defendants violated her Article I Section 20 of the North Carolina Constitutions right to be free from unlawful seizures.

122. Johnson's unlawful seizure was a foreseeable possibility once the Defendants consciously decided to include her in the vehicle containment.

123. Defendants acted willfully, wantonly, and with reckless disregard for Johnson's constitutional rights and safety by their acts or omissions in the complained of in the preceding paragraphs.

124. Pursuant to Article I Sections 20 and 36, Johnson seeks to vindicate her state constitutional rights where no other remedy may be available.

125. Johnson is entitled to recover damages.

## IV. PUNITIVE DAMAGES

126. Johnson re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

127. Defendant Tillman's conduct was willful, wanton, and done with reckless disregard for Johnson's rights.

## JURY DEMAND

128. Johnson requests a trial before a jury of her peers.

## PRAYER FOR RELIEF

Wherefore upon trial of this matter, Johnson prays that the court enter a judgment in her favor against Defendants jointly and severally.

1. Compensatory damages.

2. Punitive Damages individually against Defendant Tillman.

3. Reasonable Costs and Attorneys Fees *inter alia* pursuant to 28 U.S.C. § 2412

4. Any other relief the Court may deem just.

This the 22nd of March 2024.

/s/Dominique Camm
Dominique Camm #39565
Freedmen Law Group
609 S. New Hope Rd. Suite 200E
Gastonia, N.C. 28054
Telephone: (704) 271-2048
Fax: (704) 919-5965
dcammesq@freedmenlawgroup.com
*Counsel for Nayja Johnson*