**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**


NAYJA JOHNSON,

                Plaintiff,

v.                                  CIVIL ACTION NO.   3:24-cv-00334-TEJ

ERIC TILLMAN**,** et al.,

                Defendants.


### MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant United States of America's (the "United States" or "Government") Motion to Dismiss.   (ECF No. 9.)   For the reasons discussed herein, the motion is **GRANTED IN PART and DENIED IN PART**.

### I.  BACKGROUND

On March 23, 2021, Frankie Junior Jennings ("Jennings") was fatally shot by Eric Tillman ("Tillman") of the United States Marshals Service ("USMS").   (ECF No. 1 at 1, ¶¶ 1, 3.)   At the time of the shooting, Tillman and other members Carolina Regional Fugitive Task Force ("CRFTF") were attempting to apprehend Jennings on outstanding arrest warrants.   (*Id.* at ¶¶ 4–6.)

Leading up to the shooting, CRFTF members surveilled Jennings at several multiple locations in the Charlotte, North Carolina area, including a hotel and a car repair shop.   (*Id.* at 2, ¶¶ 11–13.)   Jennings was believed to be with his fiancée, Plaintiff Nayja Johnson ("Plaintiff").   (*See id.* at 2, ¶ 11; *id.* at 7, ¶ 58.)   During this surveillance, Jennings drove his Mercedez into a

1

gas station, followed by Plaintiff in her SUV. (*See id.* at 3, ¶ 17; *id.* at 8, ¶ 59.) There, Jennings began pumping gas for Plaintiff, while she remained in the car with the minor child she shared with Jennings. (*Id.* at 3–4, ¶¶18–19, 22, 28.)

At this point, officers made the decision to apprehend Jennings. (*Id.* at 3–4 ¶¶ 19, 24.) Plaintiff alleges that, despite the presence of other vehicles and patrons in the parking lot, officers "executed an advanced and dangerous tactical maneuver known as vehicle containment." (*Id.* at 3–4, ¶ 24.) In executing this tactic, one task force member, Tate Mills ("Mills") positioned his truck inches behind Johnson's SUV, where Jennings was pumping gas. (*Id.* at 4, ¶ 30–31.) At roughly the same time, Tillman positioned his vehicle within a few feet of Jennings's Mercedez. (*Id.* at ¶ 32.)

In response, Jennings placed his hands in the air before moving away from Plaintiff's SUV and toward his Mercedez. (*Id.* at ¶ 33.) Tillman and Mills then approached Jennings's Mercedes where a struggle ensued. (*Id.* at 34.) During this time, two additional task force vehicles arrived and maneuvered to block Jennings's Mercedez from the front. (*Id.* at 4–5, ¶¶ 35–37.) Another vehicle is moved directly in front of Johnson's SUV. (*Id.* at 5, ¶ 36.)

At this point, things took a turn for the worst. Mills had his hands on Jennings's left arm. (*Id.* ¶ 40.) Then, Jennings put the car in drive, and Mills let go of Jennings's arm. (*Id.* at 5, ¶ 40; 12, ¶ 101.) Mills evidently fell, and Tillman believed Mills was going to be dragged with the Mercedes. (*Id.* ¶ 38.) Tillman also believed that Jennings was going to "blast through the containment" and feared for himself. (*Id.*) Additionally, Tillman saw Jennings reach for a gun in the cupholder of his car. (*Id.* at ¶ 41.) Even though he never saw Jennings touch the gun, Tillman fatally shot Jennings three times in front of Plaintiff and her son. (*Id.* at 5–6, ¶¶ 41–44;

*id.* at 1 ¶ 2.)

Plaintiff subsequently brought this suit against Tillman. (*See generally id.*) The Complaint asserts three counts. Count One is a claim for Intentional Infliction of Emotional Distress ("IIED"). (*Id.* at 7–9.) Count Two is a claim for Negligent Infliction of Emotional Distress ("NIED").[1] (*Id.* at 13–14.) Count Three is a claim under the North Carolina State Constitution. (*Id.* at 14–15.) Plaintiff also seeks punitive damages. (*Id.* at 15.)

The United States moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (6). (ECF No. 9.) The Government also asked the Court to substitute it for all named defendants in the case pursuant to the Federal Torts Claims Act ("FTCA"). (*Id.*; *see also* ECF No. 8 (Notice of Substitution).) Plaintiff timely responded, (ECF No. 15), and the United States timely replied, (ECF No. 16).

The Court then held a motions hearing on November 14, 2024. (*See* ECF No. 22.) During that hearing, Plaintiff stated that she had no objection to the substitution of the United States for all named defendants.[2] Plaintiff also confirmed that she conceded her state constitutional claim.[3] Consequently, only Counts One and Two remain against the United States.

As such, the motion is fully briefed and ripe for adjudication.

---

[1] Although Count Two is styled as alleging "negligence and gross negligence," the thrust of Plaintiff's allegation is that the CRFTF's actions caused her "severe emotional distress." (ECF No. 1 at 13–14, ¶¶ 109–112, 114.) Such an allegation is on all fours with a claim for NIED by virtue of standard negligence as well as gross negligence, *see Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 395 S.E.2d 85, 97 (N.C. 1990), which is what Plaintiff clarifies she intended to plead, (*see* ECF No. 15 at 2, 8, 12).

[2] Therefore, the Court **GRANTS** the Government's motion to substitute the United States as the sole defendant for Defendant Tillman. Defendant Tillman is **DISMISSED**.

[3] In her response in opposition to the Government's Motion to Dismiss, Plaintiff does not respond to the Government's arguments regarding Count Three, (*see generally* ECF No. 15), which indicates that she has abandoned the claim, *see Fields v. King*, 576 F. Supp. 3d 392, 408 (S.D.W. Va. 2021) (collecting cases). Thus, Count Three is **DISMISSED**.

3

## II.    LEGAL STANDARDS

In this case, the Government moves to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, as well as Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.   (*See* ECF No. 9, 10.)   Each legal standard is provided in turn below.

### A.   *Rule 12(b)(1)*

It is axiomatic that a court must find it has jurisdiction before determining the validity of any claims brought before it.   *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).   "The burden of showing the existence of subject matter jurisdiction rests on the plaintiff."   *Adkins v. United States*, 923 F. Supp. 2d 853, 857 (S.D. W. Va. 2013) (citation omitted).   "If the plaintiff fails to meet this burden, then the claim must be dismissed."   *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005) (citing *Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001)).

### B.   *Rule 12(b)(6)*

A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint.   Fed. R. Civ. P. 12(b)(6).   A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim.   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007).   A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

In applying this standard, a court must utilize a two-pronged approach.   First, it must separate the legal conclusions in the complaint from the factual allegations.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   Second, assuming the truth of only the factual allegations, the court

4

must determine whether the plaintiff's complaint permits a reasonable inference that "the defendant is liable for the misconduct alleged." *Id.* Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

## III.    DISCUSSION

The Government moves to dismiss all claims in the Complaint because it is entitled to sovereign immunity. Alternatively, the Government argues that Plaintiff has failed to state a claim under each cause of action. Each theory is discussed in turn below.

### A.  Lack of Subject Matter Jurisdiction

The United States enjoys sovereign immunity except to the extent that Congress has waived it by enacting the FTCA, 28 U.S.C. §§ 2671, *et seq.* Specifically, the FTCA waives the United States' sovereign immunity and allows suits against the federal sovereign for personal injuries caused by government employees acting within the scope of their employment. *See* 28 U.S.C. § 1346(b), § 2671 *et seq.* This waiver is not absolute, though.

Congress specified a number of exceptions limiting the waiver in 28 U.S.C. § 2680, including the discretionary function exception ("DFE"). The DFE "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Berkovitz ex rel. Berkovitz*

5

*v. United States*, 486 U.S. 531, 536 (1988) (internal quotations and citations omitted). The exception "assure[s] protection for the Government against tort liability for errors in administration or in the exercise of discretionary functions." *Dalehite v. United States*, 346 U.S. 15, 26–27 (1953) (citation omitted). Under the DFE, the waiver of sovereign immunity does not apply to:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The Supreme Court has established a two-step analysis to ascertain whether the DFE applies in any given case. *See United States v. Gaubert*, 499 U.S. 315, 322 (1991).

First, courts consider whether the conduct at issue "involves an element of judgment or choice." *Rich v. United States*, 811 F.3d 140, 144 (4th Cir. 2015). Conduct involves an element of judgment or choice unless a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536; *see also Pornomo v. United States*, 814 F.3d 681, 691 (4th Cir. 2016) (explaining that the source of the directive must either expressly prescribe or proscribe "a particular course of action" in order to eliminate an agency's discretion for the purposes of the discretionary function exception). For example, an absence of discretion cannot be demonstrated by a document that sets forth recommended actions or improvements, *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180–81 (4th Cir. 2009), or a regulation that, although requiring adherence to a general standard, fails to dictate a course of action for achieving that standard, *see Rich*, 811 F.3d at 145 (explaining that nothing in the relevant regulation "requires that any specific action be taken by the various prison officials").

Second, courts consider whether the conduct at issue "involve[d] the permissible exercise

6

of policy judgment." *Berkovitz*, 486 U.S. at 537. This inquiry focuses "not on the agent's subjective intent . . . but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 at 325. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 324. If the challenged actions or omissions satisfy those two steps, the government's conduct is considered "discretionary within the meaning of the exception," and courts lack jurisdiction "whether or not the discretion involved be abused." *Pornomo*, 814 F.3d at 687 (quoting 28 U.S.C. § 2680(a)). The Fourth Circuit has stated that this second prong "exists because the very purpose of the discretionary function exception is to prevent judicial 'second-guessing' of administrative decisions grounded in social and political policy." *Medina v. United States*, 259 F.3d 220, 228 (4th Cir. 2001) (quoting *Gaubert*, 499 U.S. at 322–23).

Under this framework, "[p]laintiffs bear the burden of proving that the discretionary function exemption does not apply." *Indemnity Ins. Co. of North America*, 569 F.3d at 180. "If the plaintiff fails to meet this burden, then the claim must be dismissed." *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005). Additionally, the FTCA is strictly construed with ambiguities resolved in favor of the United States. *See United States v. Nordic Village, Inc.*, 503 U.S. 30-34 (1992); *see also Bulger v. Hurwitz*, 62 F.4th 127, 142 (4th Cir. 2023) ("[W]aivers of sovereign immunity must be strictly construed.").

Here, the Government asserts that "all claims should be dismissed to the extent they rely on [any] pre-shooting conduct" because the DFE "applies to the tactical conduct of the USMS task force and techniques used by USMS officials leading up to the arrest and the shooting." (ECF

7

No. 10 at 9 (collecting cases).)   The Government does not address either prong in *Gaubert*'s two-step analysis to ascertain whether the DFE applies in this case.   (*See generally id.*)

Conversely, Plaintiff argues that the DFE does not apply.[4]   (ECF No. 15 at 2–3.)   She claims that "[t]here are supporting federal statutes, regulation, and policies which specifically prescribes a course of action" that the Government took.   (*Id.* at 3.)   Specifically, she asserts that "there are precise federal policies or regulation that explicitly prohibit shooting at moving vehicles and using excessive force."   (*Id.* at 2.)

Additionally, Plaintiff asserts that the DFE does not cover violations of the Fourth Amendment or intentional torts, such as "false imprisonment."[5]   (ECF No. 15 at 2, 6).   Although the Complaint does not assert a *Bivens* claim[6] or any other constitutional cause of action, (*see generally* ECF No. 1), Plaintiff asserts that she was unlawfully seized, (*see id.* at 9, ¶ 70; *id.* at 11, ¶ 93; *id.* at 13–14, ¶ 111).   At the motions hearing, Plaintiff clarified that her state law claims are premised on alleged Fourth Amendment violations.

The policies raised in both counts are discussed in turn below.   Then, Plaintiff's alleged unlawful seizures in violation of the Fourth Amendment are addressed.

1. <u>USMS Policies Raised in Count One</u>

Plaintiff's IIED claim is based on the Government's "decision to include [her] as an inevitable witness and a natural barrier as a part of the vehicle containment recklessly disregarding

---

[4] Plaintiff's response in opposition to the pending motion to dismiss is scattered and borderline incoherent.   (*See generally* ECF No. 15.)
[5] "False imprisonment" is just another name of a claim for unlawful seizure in violation of the Fourth Amendment. *See Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001); *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) ("false arrest").
[6] *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) held that, while there is no explicit right to file a civil lawsuit against federal government officials who have violated the Fourth Amendment, this right can be inferred.

8

the high probability that severe emotional distress would result." (ECF No. 1 at 8, ¶ 61.) Plaintiff claims that "the CRFTF was relatively new and that some members had not completed all of their basic training." (*Id.* ¶ 64.) Additionally, "Tillman and the CRFTF had no previous prior plan to take Jennings through the advanced tactic of vehicle containment." (*Id.* ¶ 62.) Nevertheless, "Tillman and the CRFTF freestyled a plan" to apprehend Jennings using "a dangerous coordinated maneuver at a busy intersection in Charlotte," which included using Plaintiff "as part of the vehicle containment." (*Id.* at 65–66.) As a result, Plaintiff witnessed Jennings's death from only "a couple feet away" and suffered "severe and sustained emotional distress." (*See id.* at 8–9 ¶ 67–71.)

However, Plaintiff cites no mandatory statute, regulation, or governmental policy regarding training or plans to arrest. (*See generally id.*; *see also* ECF No. 15.) Plaintiff's claim cannot survive merely because she "surmise[s], without basis, the existence of some unspecified mandatory policy or procedure that might have an unexplained bearing on the case." *Bulger v. Hurwitz*, 62 F.4th 127, 145 (4th Cir. 2023) (internal quotation marks and citations omitted); *see also Hager v. United States*, 2020 WL 2544421 (S.D. W. Va. May 19, 2020) ("[A] party is not entitled . . . to go on a fishing expedition to find a basis for subject matter jurisdiction." (internal quotation marks and citations omitted).) This "would undermine the [DFE] and introduce the very litigation pressures that Congress meant to avoid when it developed the exception." *Bulger*, 62 F.4th at 145 (internal quotations and citations omitted). Instead, because Plaintiff has not met her burden, "the claim must be dismissed." *Welch*, 409 F.3d at 651.

Thus, the Government's Motion to Dismiss, (ECF No. 9), is **GRANTED** insofar as Count One is premised on the lack of training of certain CRFTF members and/or on the Government's

9

*plan on how to apprehend Jennings.*

2.  USMS Policies Raised in Count Two

Plaintiff's NIED claim is premised, in part, on the Government's failure to "consider or comply with the standard of care for high-risk law enforcement operations." (ECF No. 1 at 9, ¶ 75.) The Complaint alleges that there are "U.S. Marshals policy directives" restricting "deadly force" to only situations in which it is "necessary," *i.e.*, "when there is a reasonable belief" that a person "pose[s] an imminent danger of death or serious physical injury to another person." (*Id.* at 11–12, ¶ 95.) Plaintiff also asserts that a directive exists regarding discharging firearms at a moving vehicle. (*See id.* at 12, ¶ 97.)

To that extent, Plaintiff is correct. There is a USMS policy directive that provides that a law enforcement officer "may use deadly force only when necessary, that is, when the officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person." *See* U.S. Dep't of Just., Justice Manual § 1-16.200 (2022), available at https://www.justice.gov/jm/1-16000-department-justice-policy-use-force#:~:text=Officers%20may%20use%20only%20the,490%20U.S.%20386%20(1989).

Another directive provides, in pertinent part, the following guidance:

> [F]irearms may not be discharged at a moving vehicle unless: (1) a person in the vehicle is threatening the officer or another person with deadly force by means other than the vehicle; or (2) the vehicle is operated in a manner that threatens to cause death or serious physical injury to the officer or others, and no other objectively reasonable means of defense appear to exist, which includes moving out of the path of the vehicle.

*Id.*

Therefore, under the first *Gaubert* step, these are policies that "specifically prescribe[] a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. However, under the

10

second *Gaubert* step, these policies "allow[] a government agent to exercise discretion." *Gaubert*, 499 at 325. The first permits a law enforcement officer to use deadly force when *they* have a reasonable belief that the person poses a sufficient threat to the officer or to another person. The second permits and officer to discharge a firearm at a moving vehicle when (1) the vehicle is operated in a manner that threatens poses a sufficient threat, and (2) no other objectively reasonable means of defense appear *to the officer*. Thus, it must be presumed that Tillman's actions of using deadly force and discharging a firearm at a moving vehicle were "grounded in policy when exercising that discretion." *Gaubert*, 499 at 324. Consequently, this Court lacks jurisdiction to determine "whether or not the discretion involved be abused." *Pornomo*, 814 F.3d at 687 (quoting 28 U.S.C. § 2680(a)).[7]

Nevertheless, the Complaint also notes that a USMS policy directive states that "deadly force may not be used solely to prevent the escape of a fleeing suspect." (ECF No. 1 at 12, ¶ 96.)[8] Unlike the policy directives discussed above, this policy statement is devoid of any discretion under the second *Gaubert* step. *See* 499 at 325. Instead, it specifically prohibits using deadly force solely to prevent the escape of a fleeing subject.

Yet, Plaintiff alleges that Tillman violated this clear prohibition. (ECF No. 1 at 12–13.) Plaintiff asserts that "Jennings made no verbal threats to shoot or kill any members of the CRFTF." (*Id.* at 12, ¶ 100.) Plaintiff states that, even though Tillman said that he saw Jennings reach towards the center console where a firearm was located, "Tillman admitted that he did not see

---

[7] The Government's Motion to Dismiss, (ECF No. 9), is **GRANTED** insofar as Count Two is premised on Tillman's general use of deadly force or discharging a firearm at a moving vehicle.

[8] The quoted language matches verbatim the language of the USMS Policy Directives on the Use of Force. *See* U.S. Dep't of Just., Justice Manual § 1-16.200 (2022), available at https://www.justice.gov/jm/1-16000-department-justice-policy-use-force#:~:text=Officers%20may%20use%20only%20the,490%20U.S.%20386%20(1989). Thus, the first *Gaubert* step is satisfied. *Berkovitz*, 486 U.S. at 536.

Jennings grab the gun." (*Id.* ¶ 98.) The previously parked car was allegedly placed in gear before Jennings was shot. (*Id.* ¶ 101.) However, Plaintiff claims that nobody was in the direct path of Jennings' vehicle, (*see id.* at 12, ¶ 102), and "there was no immediate threat of serious injury" because there was no reason to believe that anyone would have been injured from Jennings's "smaller coupe" vehicle, which was "slow[ly] moving," colliding with Tillman's parked SUV, (*see id.* at 13, ¶¶ 104–05). Instead, Plaintiff claims that Jennings was shot because "Tillman believed the vehicle was moving and . . . believed Jennings was a fleeing suspect." (*Id.* ¶ 99.)

While Plaintiff has yet to prove that Tillman's "sole" reason for shooting Jennings was to prevent him from fleeing, Plaintiff's well-pleaded allegations, taken as true, make it plausible that Tillman violated a USMS directive prohibiting such action. Thus, to the extent that Count Two is premised on Tillman's alleged use of deadly force solely to prevent Jennings from fleeing, the DFE does not apply at this juncture, and the Government's Motion to Dismiss is **DENIED** insofar as it asserts sovereign immunity.

3. <u>Fourth Amendment Allegations in Counts One and Two</u>

In addition to the USMS policies discussed above, Counts One and Two are premised on Plaintiff's alleged unlawful seizures in violation of the Fourth Amendment. The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures [] shall not be violated." U.S. Const. amend. IV. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). The general rule is that "Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Dunaway v. New York*, 442 U.S. 200, 213 (1979). Probable cause is "defined in terms of facts and circumstances

12

sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks omitted and alterations in original). "Whether probable cause exists in a particular situation . . . always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir.1992). "Probable cause therefore could be lacking in a given case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both." *Id.* If a person is arrested when no reasonable officer could believe, in light of the contours of the offense at issue, that probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment right to be arrested only upon probable cause ensues. *See Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir.1996).

In this case, Plaintiff appears to allege two separate seizures. First, Plaintiff claims she was seized in the vehicle containment. Count One states that Plaintiff was included "against her will as a natural barrier and part of the vehicle containment." (ECF No. 1 at 8, ¶ 60; *see also id.* ¶¶ 61, 66.) Similarly, Count Two claims that Plaintiff was seized in the vehicle containment. (*Id.* at 11, ¶ 92; *see also id.* ¶ 88.) Plaintiff specifically alleges that her "movements were restrained by . . . the vehicle containment maneuver." (*Id.* at 4, ¶ 24.)

The second alleged seizure occurred when Plaintiff was handcuffed. Count One asserts that Plaintiff was handcuffed and "taken to the ground." (*Id.* at 8–9, ¶¶ 67, 70.) Count Two similarly states that Plaintiff was "seized . . . and held against her will and handcuffed." (*Id.* at 11, ¶ 93; *see also id.* at 13–14, ¶ 111 (same)). Assuming the truth of these well-pleaded allegations, both of the alleged seizures are plausible because Plaintiff was restrained and unable

13

to walk away.  *See Terry*, 392 U.S. at 16.

Plaintiff further alleges that there was no warrant to arrest her.  (ECF No. 1 at 4, ¶ 28.)  In fact, she claims she was not suspected of committing any crimes.  (*Id.* at 11, ¶ 88.)  Thus, assuming the truth of these well-pleaded allegations, it is plausible that Plaintiff's alleged seizures were unreasonable.  *See Alford*, 973 F.2d at 314.

Importantly, at the motion to dismiss stage, it cannot be determined based only on the Complaint's allegations whether any law enforcement officer violated Plaintiff's Fourth Amendment rights.  Nevertheless, because "governmental conduct cannot be discretionary if it violates a legal mandate," law enforcement action that offends the Fourth Amendment is not protected by the DFE.  *See Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) (citing *United States Fidelity & Guaranty Co. v. United States*, 837 F.2d 116, 120 (3d Cir.) *cert. denied*, 487 U.S. 1235 (1988)); *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) ("Federal officials do not possess discretion to violate constitutional rights or federal statutes." (quoting *Nurse*, 226 F.3d at 120)).  Therefore, the Government's Motion to Dismiss is **DENIED** insofar as Counts One or Two are premised on unlawful seizures of Plaintiff in violation of the Fourth Amendment. [9]

## B.  Failure to State a Claim

---

[9] The Government also claims that Tillman is entitled to state law immunity.  (ECF No. 10 at 13.)  Under North Carolina law, "a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto."  *Smith v. State*, 222 S.E.2d 412, 430 (N.C. 1976) (quoting *Smith v. Hefner*, 68 S.E.2d 783, 787 (N.C. 1952)).  However, the USMS policy directive that "deadly force may not be used solely to prevent the escape of a fleeing suspect" does not leave any room for judgment or discretion.  Further, public official immunity is not absolute.  In particular, public officials' actions are not shielded if their actions were "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt."  *Wilcox v. City of Asheville*, 730 S.E.2d 226, 230 (N.C. 2012). To that extent, because Plaintiff has pleaded a plausible Fourth Amendment violation, it is also plausible that Tillman acted outside the scope of his official duties.  *See Knibbs v. Momphard*, 30 F.4th 200, 228 (4th Cir. 2022) (citing *Hensley on behalf of N. Carolina v. Price*, 876 F.3d 573, 587–88 (4th Cir. 2017)).  Thus, the North Carolina public official immunity does not apply at this juncture.

14

As discussed above, Counts One and Two survive to the extent that they are based on an unlawful seizure of Plaintiff in violation of the Fourth Amendment. Additionally, Count Two survives to the extent that it is premised on Tillman's alleged use of deadly force solely to prevent Jennings from fleeing. With those limitations in mind, the Court now turns to the Government's 12(b)(6) motion and addresses each count in turn.

1. Count One

North Carolina defines the tort of IIED as: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Dickens v. Puryear*, 276 S.E.2d 325, 332 (N.C. 1981). "To state a claim, a plaintiff must allege facts sufficient to show three elements: (1) 'extreme and outrageous conduct,' (2) 'which is intended to cause' or with 'reckless indifference to the likelihood that they will cause' (3) 'severe emotional distress to another.'" *Mebane v. GKN Driveline N. Am., Inc.*, No. 1:18-CV-892, 2021 WL 4412326, at *6 (M.D.N.C. Sept. 27, 2021) (quoting *Dickens*, 276 S.E.2d at 335). North Carolina courts have held that extreme and outrageous conduct is that which "exceeds all bounds of decency tolerated by society[.]" *West v. King's Dept. Store, Inc.*, 365 S.E.2d 621, 625 (N.C. 1988). Additionally, that conduct must be "regarded as atrocious, and utterly intolerable in a civilized community." *Briggs v. Rosenthal*, 327 S.E.2d 308, 311 (N.C. Ct. App. 1985) (quoting Restatement (Second) of Torts § 46, Comment d). "Conduct constituting this cause of action may be found in 'an abuse by the actor of a position . . . which gives him . . . power to affect' the interests of another." *Turner v. Thomas*, 794 S.E.2d 439, 446 (N.C. 2016) (quoting Restatement (Second) of Torts § 46 cmt. e (Am. Law Inst. 1965)).

The second element requires that the defendant acted with "the intention of causing

15

emotional distress or with reckless indifference to the likelihood that emotional distress may result." *Dickens*, 276 S.E.2d at 333. Thus, a defendant acts with the requisite intent "when he desires to inflict severe emotional distress . . . (or) knows that such distress is certain, or substantially certain, to result from his conduct . . . . (or) where he acts recklessly . . . in deliberate disregard of a high degree of probability that the emotional distress will follow." *Id.* (internal citations omitted).

The defendant's conduct and intent are "inextricably intertwined." *Hensley v. Suttles*, 167 F. Supp. 3d 753, 768 (W.D.N.C. 2016), *aff'd sub nom. Hensley on behalf of N. Carolina v. Price*, 876 F.3d 573 (4th Cir. 2017). "In other words, conduct is deemed 'outrageous' when a defendant intends, knows, or deliberately disregards the high degree of probability that his 'extreme' threats and actions will strike fear and anguish into the heart of the victim." *Id.* (citing *Dickens*, 276 S.E.2d at 333). "Foreseeability of injury, while not an element of the tort, is a factor to consider in assessing the outrageousness of a defendant's conduct." *Turner*, 794 S.E.2d at 446.

Importantly, "[t]he *threshold* determination of whether the alleged conduct may be considered extreme and outrageous is a question of law for the trial judge." *Hensley*, 167 F. Supp. at 767 (emphasis added). However, the *ultimate* determination of whether conduct was "sufficiently extreme and outrageous to result in liability" is for the jury to decide. *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 121 (N.C. Ct. App. 1986) (citation omitted), *disc. review denied*, 346 S.E.2d 140 (N.C. 1986).[10]

Here, the Government only challenges the second element.[11] Relying on *Hensley*, the

---

[10] Curiously, the Government's brief only states that "[w]hether a defendant's alleged is "extreme and outrageous is a question of law for the trial judge." (ECF No. 10 at 10 (citing *Hensley*).)

[11] The Government presents its argument as a challenge to the first element, (*see* ECF No. 10 at 10 (arguing that Plaintiff has not plead sufficient facts to support the existence of "extreme and outrageous conduct"), but the focus of

16

Government notes that Plaintiff does not allege that Tillman sought to kill Jennings "with the intent to inflict severe emotional distress" upon Plaintiff or had "any animosity toward Plaintiff." (ECF No. 10 at 11.) However, Plaintiff's IIED claim only survives as far as it relies on her alleged unlawful seizures. As such, the proper question is whether the CRFTF had the requisite intent to inflict severe emotional distress upon Plaintiff when they allegedly seized her without probable cause.

Plaintiff's response is, again, unclear.[12] Nevertheless, Plaintiff points out that she alleged that the CRFTF "intended on violating her Fourth Amendment rights" by unlawfully seizing her. (*See* ECF No. 15 at 8–9.) Plaintiff also argues that certain reckless conduct can be sufficient to prove intent. (*Id.*)

As to being handcuffed, Count One is devoid of any allegation that law enforcement officers intended to inflict severe emotional distress or recklessly disregarded a high degree of probability that the emotional distress will follow.[13] (*See* ECF No. 1 at 7–9.) Thus, because Plaintiff has failed to sufficiently plead the second element, the Government's motion is Count One is **DISMISSED** insofar as it is based on Plaintiff being handcuffed.

As to her alleged seizure via vehicle containment, the Complaint alleges that the CRFTF "intentionally" and "deliberately" decided to include her "against her will as a natural barrier in the vehicle containment" and, in doing so, "recklessly disregard[ed] the high probability that severe emotional distress would result." (ECF No. 1 at 8, ¶¶ 60–61.) This adequately alleges

---

its discussion is on Tillman's intent. Although the first two elements are intertwined, the Government's argument more accurately challenges the second element of intent.

[12] Plaintiff makes no clear distinction between her arguments that relate to her IIED and NIED claims and meanders through discussions of recklessness, intent, and foreseeability. (*See* ECF No. 15 at 8–10.)

[13] The Court notes that Count Two does include such an allegation. (*See* ECF No. 1 at 13–14, ¶ 111.)

the second element of intent.  *See Griffin v. Mortier*, 837 F. App'x 166, 173 (4th Cir. 2020) ("[T]he complaint adequately alleges that [defendant] exhibited 'reckless indifference to the likelihood' that her conduct would cause [plaintiff] severe emotional distress." (citing *Dickens*, 276 S.E.2d at 335)).  Thus, Plaintiff has sufficiently alleged the second element, insofar as her IIED claim is based on being seized via vehicle containment.

North Carolina has set a "high threshold" for establishing extreme and outrageous conduct. *Turner*, 794 S.E.2d at 446.  Whether Plaintiff can ultimately prove her IIED claim is yet to be determined.  Nevertheless, at the motion to dismiss stage, there are sufficient allegations in the Complaint for the Court to find as a matter of law that a reasonable factfinder could conclude that Plaintiff can meet the second element of an IIED claim.

Therefore, the Motion to Dismiss is **DENIED** insofar as the Government argues that Plaintiff has failed to state an IIED claim based on her alleged seizure via vehicle containment.

2.  Count Two

As discussed above, Plaintiff's NIED claim is based on her alleged seizures by law enforcement officers and Tillman's alleged use of deadly force solely to prevent Jennings from fleeing.  (*See* ECF No.1 at 11 ¶¶ 91–94.)  Under North Carolina law, an NIED claim has three elements: (1) the defendant negligently engaged in conduct; (2) it was reasonably foreseeable that this conduct would cause severe emotional distress; and (3) the conduct did, in fact, cause severe emotional distress.  *Johnson,* 395 S.E.2d at 97.  Yet, "an allegation of ordinary negligence will suffice" if the plaintiff "allege[s] that severe emotional distress was the foreseeable and proximate result of such negligence."  *Id.*  As the first element above suggests, the Plaintiff must also establish all of the elements of negligence to satisfy the first element of an NIED claim.  *See*

*Thomas v. Weddle*, 605 S.E.2d 244, 249 (N.C. Ct. App. 2004) ("A claim for negligent infliction of emotional distress also depends upon evidence that the defendants acted negligently."); *see also Demarco v. Charlotte-Mecklenburg Hosp. Auth.*, 836 S.E.2d 322, 328 (N.C. App. 2019) (finding that when a "plaintiff has pleaded a viable claim for negligence arising from the same facts, we need only consider whether her complaint adequately pleads damages in the form of "severe emotional distress").

The Government claims that Plaintiff has failed to sufficiently plead most elements of negligence—specifically duty and breach. (ECF No. 10 at 12 (discussing common law).) In her response, Plaintiff invokes the "common law understanding of duty and breach." (ECF No. 15 at 13.) The problem herein lies with how poorly Count Two is pleaded.

As discussed above, Plaintiff's NIED claim is premised on alleged violations of the Fourth Amendment and a USMS policy directive.[14] As such, Count Two sounds in negligence *per se*, wherein "the plaintiff must allege that the defendant violated a statute, and that violation of the statute caused the plaintiff to suffer damages." *Calliste v. City of Charlotte*, 695 F. Supp. 3d 708, 726 (W.D.N.C. 2023), *aff'd sub nom. Calliste v. Lor*, No. 23-2158, 2025 WL 1743510 (4th Cir. June 24, 2025) ("With respect to the duty element . . . the statute prescribes the standard of care." (internal quotations and citations omitted)). Thus, the common law duty is inapplicable here. *Id.* (explaining that "the common law rule of ordinary care does not apply" to negligence *per se* claims).

---

[14] Nevertheless, the Court notes that the Complaint alleges that the Government breached other duties. For example, the Complaint asserts that Tillman and the CRFTF failed to "consider or comply with the standard of care for high-risk law enforcement operations." (ECF No. 1 at 9, ¶ 75; *see also id.* at 13, ¶ 108 (claiming that "Defendants fell below the standard of care necessary for high-risk operations".) Plaintiff also suggests that Tillman breached his duty "to comply with the standard of care in performing the attempted seizure of Jennings." (*Id.* at 14, ¶ 115.)

19

Instead, to prevail on a claim of negligence *per se*, a plaintiff must allege six elements:

> (1) a duty created by a statute or ordinance; (2) that the statute or ordinance was enacted to protect a class of persons which includes the plaintiff; (3) a breach of the statutory duty; (4) that the injury sustained was suffered by an interest which the statute protected; (5) that the injury was of the nature contemplated in the statute; and (6) that the violation of the statute proximately caused the injury.

*Birtha v. Stonemor, N.C., LLC*, 727 S.E.2d 1, 8 (N.C. App. 2012) (citation omitted).

As to duty,[15] "[t]he general rule in North Carolina is that the violation of a [public safety statute or ordinance] constitutes negligence *Per se*." *Byers v. Standard Concrete Prods. Co.*, 151 S.E.2d 38, 40 (N.C. 1966). A public safety statute or ordinance is one "impos[ing] upon [the defendant] a specific duty for the protection of others." *Lutz Indus., Inc. v. Dixie Home Stores,* 88 S.E.2d 333, 339 (N.C. 1955); *see also Doe v. United States*, 381 F. Supp. 3d 573, 606 (M.D.N.C. 2019) (explaining that North Carolina law permits a claim for negligence *per se* based upon a violation of a federal statute).

Consequently, the question is whether the Fourth Amendment and/or the USMS policy directive is a public safety statute/ordinance under North Carolina law. However, the parties have not briefed this issue, beyond surface-level statements. (*See* ECF No. 10 at 14 (offering a single sentence that that Plaintiff does not allege that a USMS policy created a duty owed to her, particularly as a bystander); *see also* ECF No. 15 at 13 (stating that a Fourth Amendment violation is a breach of a standard of care implicit in the Fourth Amendment).) These bare references are insufficient for the Court to consider the issue. Therefore, the Court **DENIES WITHOUT PREJUDICE** the Government's 12(b)(6) Motion to Dismiss as to Plaintiff's NIED claim.

---

[15] The Government also asserts that Plaintiff has failed to allege how any duty was breached. (ECF No. 10 at 12.) However, because Plaintiff's claim is for negligence *per se*, the breach is by allegedly violating a statutory duty.

## IV.    CONCLUSION

For these reasons, the Government's Motion to Dismiss, (ECF No. 9), is **GRANTED IN PART and DENIED IN PART**.[16]   To be clear, the Court **GRANTS** the Government's motion to substitute the United States as the sole defendant for Defendant Tillman and **DISMISSES** Defendant Tillman from this matter.   Count One survives only to the extent that it is premised on Plaintiff's alleged seizure via vehicle containment.   Count Two survives to the extent that it is based on either of Plaintiff's alleged seizures and/or Tillman's alleged violation of the USMS policy directive prohibiting use of deadly force solely to prevent the escape of Jennings.   Count Three is **DISMISSED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:       August 25, 2025

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

---

[16] The Government's Unopposed Motion to Withdraw, (ECF No. 24), is also **GRANTED**.

21